## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JEROME LYNN HOLLY,

        Petitioner,

v.                                  CV 12-0952 MCA/WPL

ERASMO BRAVO,

        Respondent.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Jerome Lynn Holly filed his pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in September 2012. (Doc. 1.) On September 30, 2013, with the assistance of court-appointed counsel, Holly filed a motion for leave to amend his habeas petition, expressly seeking to add claims that were not included in his original petition. (Doc. 27.) Erasmo Bravo asserts that Holly's original habeas petition is untimely (Doc. 10) and opposes the motion for leave to amend (Doc. 28). For the reasons stated herein, I recommend that Holly's habeas petition be denied as untimely and that his motion for leave to amend be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

### I.      State Court Proceedings

On September 15, 2003, two people were shot at a nightclub outside of Alamogordo, New Mexico, leading to one death. (Doc. 10 Ex. E.) Holly was charged with several offenses related to that event, and on October 21, 2003, Holly's family paid Texas attorney Gary Hill $75,000 to represent Holly. (*See* Petitioner's Exhibit C.) Holly and Hill did not have a written retainer agreement or any written description of the services Hill would provide in representing

Holly. Hill later contracted with another attorney, Mary Stillinger, to assist with representing Holly at trial. Holly acknowledges that Stillinger represented him before and during the trial phase of his case.

Holly entered a plea of no contest to charges of tampering with evidence and racketeering in November 2004, and a jury convicted him on first degree murder and attempted first degree murder charges in December 2004. On April 26, 2005, the Twelfth Judicial District Court, Otero County, New Mexico, held a sentencing hearing on these offenses, at which Stillinger appeared with Holly as his attorney. Hill was not present for that hearing. The next day, the court issued a Judgment and Sentence finding Holly guilty of those four offenses and sentencing him to life plus twenty and a half years of imprisonment. (Doc. 10 Ex. A.)

Stillinger filed a Notice of Appeal with the New Mexico Supreme Court on Holly's behalf on the same day that the Judgment and Sentence was issued. (Doc. 10 Ex. B.) Stillinger later filed a Statement of the Issues with the state supreme court on Holly's behalf. (Doc. 10 Ex. C.) On the latter document, Stillinger is identified as "Trial Counsel" for Holly. Hill was not listed as Holly's attorney on either document.

Assistant Public Defender Karl Erich Martell was appointed to represent Holly on direct appeal on or around November 15, 2007. Martell represented Holly at oral argument before the state supreme court in September of 2008.

The New Mexico Supreme Court affirmed Holly's convictions on January 29, 2009. (Doc. 10 Exs. B, H.) The following day, Martell sent a letter to Holly explaining the state supreme court's ruling and promising to send a copy of the mandate to him upon receipt. (Respondent's Exhibit 2.) This letter was carbon copied to Stillinger but not Hill. (*Id.*)

Holly concedes that he did not file a motion for rehearing or seek certiorari from the United States Supreme Court. The state supreme court issued its mandate on February 16, 2009. (Doc. 10 Ex. I.) The next day, Martell sent a letter to Holly that included the mandate and that also included the following passage:

> If you want to continue fighting your case, you may file a state or federal habeas corpus petition. If you plan to raise new issues, you must begin with a state habeas petition. Otherwise, you would begin with a federal habeas petition. If you decide to file a federal habeas petition, you must file within one year from the date the opinion was filed. If you pursue a state habeas petition first, the time during which your state habeas petition is pending will temporarily delay, but not restart, this one year deadline. For example, if you wait three months before filing your State habeas, you will have only nine months after the conclusion of your state habeas appeal to file a federal habeas petition.

(Respondent's Exhibit 3 (emphasis in original).) As before, this letter was carbon copied to Stillinger but not Hill. (*Id.*)

Holly filed a pro se petition for a writ of habeas corpus in state trial court on December 19, 2011 (Doc. 10 Ex. J), and a second-or-successive petition on February 12, 2012 (Doc. 10 Ex. L). These petitions were each dismissed (Doc. 10 Exs. K, O), and the New Mexico Supreme Court denied certiorari (Doc. 10 Ex. S).

## II.    Federal Habeas Proceedings

Holly filed his federal habeas petition on September 10, 2012, alleging five grounds for relief. (Doc. 1.) First, Holly argues that he was improperly denied evidentiary hearings at every stage of his state habeas proceedings. Second, Holly alleges that police and prosecutors withheld exculpatory evidence, namely secretly taped conversations between himself and Dale Yon, who later served as a prosecution witness in Holly's criminal trial. (Doc. 14 at 3; Doc. 1 at 2.)[1] Third,

---

[1] The second page of Holly's § 2254 petition was not included in his original filing. (*See* Doc. 1.) Because it was not clear whether this error was attributable to an oversight by Holly or some other reason, and in the interest of justice, I ordered Holly to submit the missing page. (Doc. 11.) Holly filed the missing page shortly thereafter. (Doc. 14 at 3.)

Holly alleges that his conviction was the result of a conspiracy between the trial court, the district attorney, and Holly's own defense counsel. (Doc. 1 at 2.) Fourth, Holly claims that his conviction was the result of prosecutorial misconduct, namely its refusal "to correct known false testimony by witness Yon." (*Id.* at 2-3.) Finally, Holly alleges ineffective assistance of counsel, claiming that his attorney failed to properly investigate Yon prior to trial and therefore failed to learn of the taped conversations and of Yon's "personal vendetta" against Holly. (*Id.* at 3.) In addition to these stated grounds for relief, Holly claims that his trial attorney falsely represented that he had filed a motion for rehearing. (*Id.* at 9-10.) Holly says that he attempted to contact this attorney numerous times before ultimately filing his state habeas petition, but the attorney "was never at [his] office and never returned calls." (*Id.* at 10.)

On September 30, 2013, Holly filed his response to Holly's petition on January 17, 2013, arguing among other things that Holly's petition is untimely. (Doc. 10.) Shortly thereafter, I scheduled an evidentiary hearing to determine whether Holly might be entitled to equitable tolling of the one-year limitations period for filing his habeas petition. (Doc. 15.) I also appointed the Federal Public Defender to represent Holly, though I limited this representation solely to the evidentiary hearing and the equitable tolling issue. (*See id.* at 3.)

On September 30, 2013, Holly filed a motion to amend his petition. (Doc. 27.) Holly's proposed amended petition raises numerous claims that he wishes to add to his original petition, including further development of his request for equitable tolling. (*See* Doc. 37 Ex. 1.) Bravo opposes this motion. (Doc. 28.)

### III.     Evidentiary Hearing

On May 22, 2014, I conducted an evidentiary hearing for the sole and limited purpose of determining whether Holly's habeas petition is subject to equitable tolling. (*See* Doc. 53.)[2] Holly testified at the hearing and presented testimony from Ronald Sugamosto and Wiremu "Mu" Taiaroa. Martell testified on behalf of Bravo.

The undisputed testimony established that Holly paid Hill $75,000 for representation in 2003, that Stillinger represented Holly at trial but that Hill was present throughout those proceedings, and that Stillinger alone appeared for Holly at his sentencing. It was also established that following Holly's conviction, Hill never again appeared at any hearings on Holly's behalf or drafted or filed any court documents for Holly.

Although Holly claimed that Hill promised to work closely with Martell during his appeal, Martell testified that he was Holly's sole attorney after his appointment and that he understands state law to effectively preclude dual representation of a litigant by both a public defender and private counsel. Martell spoke to Hill once in January 2008 to discuss the trial and the strength of Holly's appellate case, but Martell said that Hill never claimed to be representing Holly at that time, and Martell never spoke to Hill again after that.

Martell testified that on the day that the state supreme court affirmed Holly's convictions, he called Holly to inform him of the decision and discussed the possibility of pursuing habeas relief. Martell stated that he "always urge[s] [clients] to get one of the habeas packets" available to them from prison law libraries. Holly claimed that Martell discussed the possibility of filing "some type of rehearing or appeal" request during that phone call, but Martell stated that the men

---

[2] Although I originally scheduled the evidentiary hearing for early 2013, the parties twice moved to continue the evidentiary hearing. (*See* Doc. 18; Doc. 22.) At a status conference after the second extension was granted, Holly expressed a desire to file an amended petition. (*See* Doc. 26.) I set another status conference to reschedule the evidentiary hearing once I had an opportunity to review Holly's motion to amend his petition. (*See* Doc. 29.)

did not discuss petitions for rehearing with the state supreme court or for certiorari with the United States Supreme Court. Moreover, Martell was adamant that he would never have recommended those options under the circumstances. Martell conceded that "an unschooled person would have more of a difficult time . . . comprehending" the distinction between habeas relief and motions for rehearing, but he does not know what Holly thought at the time. According to Martell's notes from the phone call, he told Holly that he could provide the names of attorneys who might be available for habeas or post-conviction proceedings, but he testified that Holly never contacted him for such names. Martell said that he typically tells clients to file their initial habeas petitions on their own.

Holly claimed to have been in regular contact with Hill after the state supreme court affirmed his conviction until approximately 2011. He testified that this contact came in the form of direct phone calls to Hill on a secure line, conference calls with his cousin or his friend Sugamosto using an unsecured phone in his prison housing unit, written messages, or verbal messages relayed by Sugamosto or Taiaroa. Sugamosto and Taiaroa also testified to relaying verbal and occasional written correspondence between Holly and Hill, but Sugamosto insisted that he never arranged any conference calls. Holly introduced into evidence a document demonstrating that he spoke to Hill for two minutes over a secure line once in October 2009 (*see* Petitioner's Exhibit A), but otherwise he submitted no proof of any further direct phone contact with Hill.

Regardless, no one disputed that Holly and Hill never discussed specific time limits or legal procedures that were applicable to his case. Holly admitted that Hill never promised to take any particular actions on his behalf, instead simply assuring Holly in very general terms that he was continuing to work on securing Holly's release from prison. Holly continued to insist that he

had been "led to believe" that Hill was going to file a motion for rehearing on his behalf, but he did not explain why he believed this to be the case. For their part, Sugamosto and Taiaroa admitted to discussing Holly's case with Hill, but only in general terms; the only specifics Sugamosto recounted is that Hill voiced his plans to "hire a guy" to get Holly's case reopened. Both Sugamosto and Taiaroa confirmed that many or most of their conversations with Hill concerned their shared interest in horse racing rather than Holly's case.

Martell stated that Holly sent a letter to him in May 2011 requesting his trial-level discovery. Martell responded on May 24, 2011, and told Holly to contact his trial lawyers for that request, as his office does not receive those materials. Martell stated, and Holly did not dispute, that this was the sole contact between the two men after February 2009. Martell did not know whether Holly contacted Hill for his trial discovery materials.

Holly testified that he began filling out forms from a packet of habeas materials available in the prison law library sometime in September or October 2011, after learning from Sugamosto several months earlier that Hill was suffering from personal problems. He recalled that the packet included detailed instructions for the procedures for filing a habeas petition, and on prompting from Bravo's counsel, he conceded that the packet he used included "something . . . about the statute of limitations" that was consistent with Martell's 2009 letter to him. Bravo then introduced Respondent's Exhibit 19, a packet of state and federal habeas applications acquired from the Guadalupe County Correctional Facility. This exhibit contains instructions stating that federal habeas corpus petitions must be filed "one year from the last official event in [the petitioner's] case." Holly acknowledged that this packet "looks a little familiar," but he would not confirm whether the exhibit was completely identical to the packet he used.

## LEGAL STANDARDS

"A threshold requirement of any habeas claim is that it must be timely filed." *See United States v. Pursley*, No. 03-cr-00415-REB-KLM-02, 08-cv-01655-REB-KLM, 2009 WL 1505164, at *2 (D. Colo. May 28, 2009) (unpublished). The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year limitation on habeas claims brought under § 2254. *See* 28 U.S.C. § 2244(d)(1). This one-year period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; [or]

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

*Id.* § 2244(d)(1)(A)-(B).[3]

"[A] judgment becomes final when the defendant has exhausted all direct appeals in state court and the time to petition for a writ of certiorari from the United States Supreme Court has expired (which is 90 days after the decision by the State's highest court)." *Woodward v. Cline*, 693 F.3d 1289, 1292 (10th Cir. 2012); *see also* U.S. SUP. CT. R. 13(1). Moreover, the AEDPA statute of limitations is tolled "during the period in which the petitioner could have sought an appeal under state law," even if he does not do so. *See Gibson v. Klinger*, 232 F.3d 799, 806 (10th Cir. 2000). This period includes any time allowed for a defendant to seek rehearing from the state's highest court. *See Serrano v. Williams*, 383 F.3d 1181, 1185 (10th Cir. 2004).

A "properly filed application for State post-conviction or other collateral review" also tolls the federal statute of limitations period. *See id.* § 2244(d)(2). However, the state application is only "properly filed" if it is filed within the one year allowed by AEDPA. *See Clark v.*

---

[3] Although § 2244(d)(1) provides other potential dates for measuring the one-year limitations period, *see* 28 U.S.C. § 2244(d)(1)(C)-(D), neither of those provisions are implicated by Holly's petition or other filings.

*Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006). In other words, AEDPA's one-year limitations period is not tolled or restarted if a state habeas application is filed outside of that one-year window.

The untimeliness of a petition under § 2254 is an affirmative defense that generally must be raised by the respondent. *Kilgore v. Attorney Gen.*, 519 F.3d 1084, 1086-87 (10th Cir. 2008) (citing *Day v. McDonough*, 547 U.S. 198, 202 (2006)).

DISCUSSION

Here, Bravo has raised the defense of untimeliness in his answer. The state supreme court affirmed Holly's conviction on January 29, 2009. Under New Mexico law, Holly had an additional fifteen days to request rehearing, N.M. R. APP. P. 12-404(A), which he did not do. From that date, Holly had an additional ninety days to petition for a writ of certiorari from the United States Supreme Court, *see* U.S. SUP. CT. R. 13(1), which he also did not do. Accordingly, Holly's judgment became final for § 2244(d)(1) purposes on May 14, 2009. *See Woodward*, 693 F.3d at 1292. Unless the Court finds either that an unconstitutional or illegal impediment resulting from state action prevented Holly from timely filing or that equitable tolling is warranted, Holly's one-year limitations period under AEDPA would have expired on May 14, 2010, *see* 28 U.S.C. § 2244(d)(1), and would not have been tolled by Holly's December 2011 state habeas petition, *see Clark*, 468 F.3d at 714.

## I.  Impediment Created by State Action

In the context of discussing the AEDPA statute of limitations, Holly claims that his attorney acted "in furtherance of a conspiracy" and that the limitations period only began to run "upon removal of [an] unconstitutional impediment." Since Holly alleges in other claims that his attorney "conspired with the state court judge and d[istrict] a[ttorney]" in prosecuting him, I

liberally construe Holly's pro se petition as alleging that the failure of his attorneys to timely file his federal habeas petition constituted an "impediment . . . created by State action in violation of the Constitution or laws of the United States." *See* 28 U.S.C. § 2244(d)(1)(B); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citations omitted) ("A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers.").

Counsel for Holly stated at the evidentiary hearing that he does not dispute Bravo's calculation of the one-year statute of limitations expiring on May 14, 2010, and as such it appears that Holly has abandoned his argument under § 2244(d)(1)(B). In any case, the pleadings and evidence do not support this claim. The only facts mentioned in Holly's original habeas petition concerning the AEDPA limitations period relate solely to his attorney's failure to "submit[] a motion for rehearing [or] reconsideration." Holly recites no facts that suggest any state action impeded the filing of his habeas petition, *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted), and none of his filings since the inception of this action have remotely suggested the involvement of state actors in the delayed filing. Although the scope of the evidentiary hearing was limited to ascertaining facts relating to equitable tolling, the circumstances surrounding the filing of his state and federal habeas pleadings were thoroughly explored at that hearing, and at no point was any state involvement raised or suggested by Holly or his witnesses.

Given the utter lack of factual allegations or evidence to support an argument that state action impeded the timely filing of Holly's federal habeas petition, I find that § 2244(d)(1)(B) is inapplicable to Holly's petition. I therefore proceed to consider whether Holly's petition is subject to equitable tolling.

## II.     Equitable Tolling

A. Underlying Principles

Equitable tolling of the one-year statute of limitations under AEDPA applies only in "rare and exceptional circumstances." *Sigala v. Bravo*, 656 F.3d 1125, 1127 (10th Cir. 2011) (citation omitted). To be entitled to equitable tolling, a litigant must establish (1) that he has been pursuing his rights diligently, (2) that some extraordinary circumstance arose, and (3) the extraordinary circumstance caused his petition to be untimely. *Yang v. Archuleta*, 525 F.3d 925, 928 (10th Cir. 2008) (quotations omitted); *Fleming v. Evans*, 481 F.3d 1249, 1257 (10th Cir. 2007) (citation omitted); *see also Holland v. Florida*, 560 U.S. 631, 649 (2010) (holding that the extraordinary circumstances must have "prevented timely filing"). The habeas petitioner bears the burden of establishing that equitable tolling should apply. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *see also Yang*, 525 F.3d at 928 (requiring a showing of "specific facts to support [a] claim of extraordinary circumstances and due diligence").[4]

To establish diligence, a habeas petitioner only needs to show that he engaged in "reasonable diligence" rather than "maximum feasible diligence." *Holland*, 560 U.S. at 653. Thus, even though a petitioner did not learn from his attorney about a state court's denial of habeas relief until almost a month had passed, he was still not entitled to equitable tolling because he received notice of the state court's denial fifty days before the AEDPA limitations period expired yet still did not submit a timely petition. *See Coppage v. McKune*, 534 F.3d 1279, 1281-82 (10th Cir. 2008). By contrast, a prisoner who repeatedly contacted his attorney, state courts and their clerks, and the state bar association to have his allegedly ineffective attorney

---

[4] Holly notes that the Court in *Holland* asserted that there is "a rebuttable presumption in *favor* of equitable tolling." *Holland*, 560 U.S. at 646 (quotation omitted). To be clear, the Court raised this point in considering whether AEDPA's statutory limitations period might be equitably tolled at all, not in the context of determining whether an individual petitioner is entitled to equitable tolling. *See id.* at 645-49.

removed, and who drafted a pro se habeas petition as soon as he discovered that his attorney's misconduct had allowed the AEDPA limitations period to expire, had easily met this standard. *See Holland*, 560 U.S. at 563. So, too, did a prisoner who was placed in segregation and saw his legal materials confiscated two months prior to the limitations deadline, as he made numerous requests for his legal materials while in segregation and submitted a petition almost immediately after his materials were returned to him. *United States v. Gabaldon*, 522 F.3d 1121, 1123 (10th Cir. 2008).

The "extraordinary circumstance" prong is somewhat less forgiving. As a general rule, attorney negligence "is not generally a basis for equitable tolling"; after all, habeas petitioners, "even if incarcerated, must 'vigilantly oversee,' and ultimately bear responsibility for, their attorneys' actions or failures." *See Fleming*, 481 F.3d at 1255-56 (quotation omitted). Still, the Tenth Circuit has recognized for several years that "sufficiently egregious misconduct on the part of a habeas petitioner's counsel" may constitute "extraordinary circumstances" for equitable tolling purposes. *See id.* at 1256. In *Fleming*, the habeas petitioner alleged that his post-conviction attorney repeatedly and affirmatively misrepresented that he was preparing a state habeas petition for filing during AEDPA's one-year window when, in fact, the attorney failed to file any petition on the petitioner's behalf. *See id.* at 1255-56. According to the petitioner, he drafted his own petition and submitted it to counsel for review and filing in light of the fast-approaching limitations deadline, but the attorney did not file the petition until after the AEDPA limitations period expired. *See id.* at 1256. The Tenth Circuit concluded that the petitioner had alleged enough facts to at least warrant an evidentiary hearing to determine whether equitable tolling was appropriate. *See id.* at 1256-57.

The holding in *Fleming* was consistent with the Supreme Court's decision in *Holland* three years later. There, a prisoner who was dissatisfied with his attorney's rare communications during state-court post-conviction proceedings was unsuccessful in having his attorney removed from his case despite repeatedly begging the state supreme court to do so. *See* 560 U.S. at 636-37. Subsequently the prisoner's attorney did not timely notify him that his state post-conviction proceedings had ended, ignored his repeated letters and phone calls seeking a status update and inquiring specifically about the AEDPA limitations period, misunderstood and misconstrued the law governing the limitations period, and failed to file a federal habeas petition on the prisoner's behalf despite his repeated requests. *See id.* at 638-43. Throughout this period, the prisoner filed complaints against his attorney with the state bar association. *See id.* at 637, 643. The Supreme Court concluded that these facts might represent "extraordinary circumstances" justifying equitable tolling, rejecting as "too rigid" a lower court's holding that an attorney's "grossly negligent" conduct could never warrant tolling without, *inter alia*, bad faith or dishonesty. *Id.* at 649, 652-53. Instead, the Court directed lower courts to remain flexible, "exercis[ing] judgment in light of prior precedent, but with awareness of the fact that specific circumstances . . . could warrant special treatment in an appropriate case." *Id.* at 650. The key principle, similar to that enunciated in *Fleming*, is that "egregious behavior" on an attorney's part may sometimes "create an extraordinary circumstance that warrants equitable tolling," whereas "garden variety" or "excusable neglect" would not. *See id.* at 652.

That said, "attorney error, miscalculation, inadequate research, or other mistakes," such as mistakes in interpreting a statute of limitations, will generally not rise to the level of "extraordinary circumstances" for equitable tolling purposes. *See Fleming*, 481 F.3d at 1256 (quotation omitted). For example, the Tenth Circuit has consistently found in unpublished

decisions that equitable tolling is not required where an attorney simply failed to stay in regular contact with his client, despite the attorney's ethical obligation to do so. *See Broadus v. Hartley*, 345 F. App'x 345, 348-49 (10th Cir. 2009) (unpublished); *Santana v. Trani*, 341 F. App'x 360, 363 (10th Cir. 2009) (unpublished). In another case, when a habeas attorney fell seriously ill just sixteen days before the AEDPA filing deadline expired, the Tenth Circuit did not find those circumstances sufficiently extraordinary despite the petitioner's unawareness of his attorney's health problems, since the attorney was released from the hospital after only four days and could have filed a "skeletal" petition in the remaining time. *See Bradford v. Horton*, 350 F. App'x 307, 309 (10th Cir. 2009) (unpublished).

Moreover, persuasive caselaw suggests that there are limits to the extent that an untimely petition can be excused by egregious attorney conduct. In one case, even assuming that habeas counsel's failure to communicate at all with the petitioner tolled the limitations period until he fired her, the petitioner's failure to pursue state post-conviction relief for the bulk of the next two years was not excused by that conduct. *See Penn v. Kline*, 348 F. App'x 344, 345-47 (10th Cir. 2009) (unpublished). Other cases stand for the proposition that the mistaken belief that one's attorney is pursuing habeas relief on his behalf, without more, does not itself trigger equitable tolling since habeas petitioners bear the ultimate responsibility for monitoring the status of their cases. *See, e.g.*, *Brown v. United States*, 20 F. App'x 373, 375 (6th Cir. 2001) (unpublished) (citing *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999)); *United States v. Nichols*, Crim. A. No. 03-20149-01-KHV, Civ. A. No. 11-2114-KHV, 2011 WL 4553033, at *2 (D. Kan. Sept. 29, 2011) (unpublished) (citations omitted).

B.  Findings from the Pleadings and the Hearing

Aware of this precedent, I determined that an evidentiary hearing on the question of equitable tolling in Holly's case was appropriate. In his original habeas petition, Holly states that one of his attorneys "personally informed [him] that [the attorney] had submitted a motion for rehearing_reconsideration_[*sic*]." Holly goes on to claim that his caseworker "and her logs will reveal that [he] made numerous calls to counsel without an[y] response" and that "counsel was never at [his] office and never returned calls," implying that Holly was working diligently to make sure his filings satisfied the statute of limitations. These allegations were sufficiently analogous to those raised in *Fleming* to warrant the sort of evidentiary hearing called for in that case and suggested in *Holland*.

During the hearing, however, Holly's assertions changed substantially. First, taking Holly's own testimony at face value, none of his attorneys at any stage of proceedings "personally informed [him]" that any attorney "had submitted" a motion for rehearing. Holly claimed that he and Martell had discussed such a motion and that Martell said "he would maybe be considering filing" that motion. Yet Holly did not assert that Martell ever filed such a motion, instead noting that he was relying on Hill to do so. Holly testified that after Martell raised the rehearing option, he passed that information to Hill and asked Hill "if he was going to do anything, and he said he would." However, Holly admitted that he and Hill never specifically discussed filing this or any other motion and never specifically discussed filing deadlines. In fact, Holly averred that he never "specifically ask[ed] direct questions" regarding the nature of the work Hill was purportedly doing on his case. This was consistent with the testimony of Holly's longtime friend Taiaroa, who said that Hill never claimed that he was going to file a motion for rehearing or any other documents on Holly's behalf. Thus, despite the allegations in Holly's

petition, there was no evidence that Hill or any other attorney claimed to have submitted a motion for rehearing or that Holly was waiting for such a motion to be resolved before filing his federal habeas petition.

Second, despite the claims in his petition, Holly did not present testimony from his caseworker, and he did not present any direct evidence of any phone calls to Hill except for a single Attorney Phone Call Request for October 28, 2009 (Petitioner's Exhibit A), at which time Holly claims to have simply discussed "the status of [his] case" with Hill. Although Holly introduced logs of phone calls he made from his housing unit on an unsecured line (*see* Petitioner's Exhibit B), those only cover the calendar year 2011 and do not list any phone calls directly to Hill. Instead, the logs show many calls to Holly's parents, seven calls to Sugamosto, and over two dozen calls to Holly's grandmother's house, among others. Holly testified that he often spoke to Hill by calling his cousin at his grandmother's house or by calling Sugamosto; the recipient would then arrange for a three-way call with Hill. However, Holly did not present testimony from his cousin, and Sugamosto testified that not only did no such calls take place, but he also believed it was impossible to arrange a three-way call with a prison phone number.

The inconsistencies multiplied as the hearing continued. In direct contradiction to Holly's testimony, Martell asserted that he never advised Holly to consider a motion for rehearing, and he credibly claimed that he never would have recommended that course of action under Holly's circumstances. Further, although Holly testified that Hill held himself out as continuing to do legal work on Holly's behalf during the direct appellate phase of proceedings, Martell testified that he only spoke to Hill once during that time, that Hill was never involved in Holly's appeal as counsel, and that Hill never held himself out as continuing to represent Holly. These inconsistencies—between Holly's statements in his habeas petition and the evidence he

presented at the hearing, and between his testimony and the credible testimony of the other witnesses—cast significant doubt on Holly's credibility.

In light of the above, I do not find Holly's testimony concerning Hill's post-judgment involvement in his case to be fully credible. For example, Holly's assertion that Hill conveyed an intention to work with Martell during his appellate proceedings and thereafter is inconsistent with Sugamosto's testimony that Hill felt bad about Stillinger's performance at trial and was merely planning to "hire a guy" to help get Holly's case reopened. It is also inconsistent with Martell's testimony that Hill never dually represented Holly alongside him and that Hill only spoke to him once in a single phone call during appellate proceedings. It is unsupported by any written representation agreement or any testimony by Hill or by Holly's parents, who were allegedly present when Hill agreed to represent Holly at the outset. Finally, it is inconsistent with Hill's failure to appear at any appellate proceedings on Holly's behalf or to sign onto any of Holly's appellate paperwork.

I also do not credit Holly's statements that he was in frequent telephonic contact with Hill following the state supreme court's decision to affirm his conviction, either directly or via three-way calling with his cousin or Sugamosto. Holly's testimony is inconsistent with Sugamosto's testimony on this matter, and the remaining evidence that Holly presented shows only one brief conversation between Holly and Hill in October 2009.

This does not mean that Holly and Hill were not sometimes in indirect contact. Sugamosto testified that Holly sent him messages and letters to convey to Hill, and Taiaroa testified that he and Hill discussed Holly's case regularly and that at one point in 2011 Holly was calling Taiaroa's office "almost every single day asking [Taiaroa] to get in contact with [Hill]." Though the content of these communications is unclear, we know that Hill generally told

Sugamosto that he simply intended to hire someone to somehow get Holly's case reopened, and Hill told Taiaroa that he was simply "working on getting [Holly] out." At some point in 2011, Holly also told Taiaroa that he needed to file something within a certain period of time and that he was unsuccessfully trying to reach Hill. This testimony does not establish what exact actions Holly wanted Hill to take on his behalf or, indeed, whether Holly wanted Hill to do anything for him at all. Notably, though, Martell testified that he suggested in May 2011 that Holly contact trial counsel for his trial-level discovery, which may hint at Holly's reason for attempting to reach Hill at that time.

Ultimately, Holly presented no credible evidence that Hill ever acted as his attorney at all following his conviction. He and Hill did not have a written retainer agreement, and he did not present testimony from his parents, whom he says were present when the men allegedly entered into a verbal representation agreement. Further, the credible testimony at the evidentiary hearing mentions only one specific action that Hill intended or was expected to take for Holly following his conviction—finding him a new attorney to reopen his case. Otherwise, the credible testimony does not establish that Hill appeared at any hearings on Holly's behalf, drafted or filed any documents for him, promised to file any documents for him, advised him on how to proceed with his case, or otherwise provided any legal services to him following his December 2004 conviction.

Conversely, I find that Holly was well aware of the one-year AEDPA limitations period, even before that clock began to tick on May 14, 2009. At the very latest, Holly became aware of the existence of this limitations period on or around February 17, 2009, one day after the state supreme court affirmed his conviction, when Martell sent him a letter expressly discussing this limitations period.

C.  <u>Application</u>

Assuming for the sake of argument that Hill was acting as Holly's counsel during the AEDPA limitations period, it is clear that the facts before the Court do not rise to the level of "sufficiently egregious misconduct" found to justify equitable tolling in previous cases. Holly never appeared to lack in representation due to Hill's actions, *cf. Holland*, 560 U.S. at 636-37; instead, Martell represented him throughout appellate proceedings and even offered to refer him to potential habeas counsel. Holly did not receive untimely notification that AEDPA's limitations period had started due to counsel's conduct, *cf. id.* at 639; instead, he learned about both the state supreme court's decision and the start of the limitations period from Martell, his sole appellate attorney, on or around the day the decision was filed. Hill never deceived Holly by giving an impression that "he was in the midst of preparing and filing" any habeas documents *Cf. Fleming*, 481 F.3d at 1255. In fact, Holly never spoke to Hill about filing a habeas petition, let alone "several times," and Hill never made any representations about work on any such document. *Cf. id.* at 1256.

What Holly has credibly shown is that, although he remained in at least occasional indirect contact with Hill during the AEDPA limitations period, the men did not specifically discuss the filing of either a motion for rehearing before the state supreme court or a state or federal habeas petition. Rather than asking Hill to do either of these things, and despite his personal knowledge of the limitations period, Holly elected not to "go into details like that" and simply "figured [Hill] was in control of the situation." As Taiaroa noted, Holly only attempted to communicate his concerns regarding some sort of impending deadline to Hill sometime in 2011, well after the AEDPA limitations period had already expired, and it is not even clear whether or what Holly wanted Hill to do in response.

Far from showing "egregious attorney misconduct," this pattern of behavior suggests negligence on Holly's own part. Since habeas petitioners "must 'vigilantly oversee,' and ultimately bear responsibility for, their attorneys' actions or failures," Holly cannot viably assert that Hill is responsible for missing the AEDPA filing deadline when Holly never asked Hill to prepare or file a habeas petition for him in the first place. *See Fleming*, 481 F.3d at 1255-56. Even the earnest but mistaken belief that Hill was preparing such a petition does not suffice under these circumstances, as Holly never asked that Hill do so and did not timely inquire as to whether this was the case. *See Brown*, 20 F. App'x at 375 (citing *Coleman*, 184 F.3d at 402); *Nichols*, 2011 WL 4553033, at *2. Therefore, Holly cannot satisfy the "exceptional circumstances" requirement for equitable tolling on the basis of egregious behavior. *Cf. Fleming*, 481 F.3d at 1256-57.

Additionally, even if Hill's conduct could somehow constitute egregious behavior, Holly's admitted failure to even ask Hill to file a habeas petition on his behalf within the statute of limitations disqualifies him for equitable tolling since he failed to show the requisite diligence during that period. *See id.* Although a petitioner need not demonstrate "maximum feasible diligence" for equitable tolling to apply, *see Holland*, 560 U.S. at 653, Holly did not file his state habeas petition until almost a year and a half after his AEDPA deadline expired. Even after Holly learned from Taiaroa that Hill was not returning any phone calls from friends in the spring or early summer of 2011, by his own testimony he did not begin working on his state post-conviction petition for several more months. Holly gives no explanation for this delay. Under these circumstances, Holly has failed to demonstrate that he engaged in even minimal diligence with respect to his habeas petition.

Finally, again assuming that Hill's conduct could be deemed egregious, Holly has not shown how that conduct prevented him from timely filing a state or federal petition. *See id.* at 649; *Fleming*, 481 F.3d at 1257 (citation omitted). He cannot blame Hill for his lack of knowledge regarding the AEDPA statute of limitations, since Martell's phone call and letter to him gave notice of that deadline well before the limitations period began to run. He cannot say that Hill's actions deprived him of access to legal materials, since he testified that he was aware that prison law libraries had packets of habeas forms and instructions thanks to his work at the Torrance County Detention Facility law library prior to 2008. In short, Holly has failed to draw any causal relationship between Hill's allegedly egregious behavior and his untimely habeas filing.

Holly concedes that his AEDPA limitations period ended on May 14, 2010, and he has failed to show that he diligently pursued habeas relief during this period or that some exceptional circumstances prevented him from doing so. Accordingly, I recommend that the Court deny Holly's request that the one-year statute of limitations under 28 U.S.C. § 2244(d) be equitably tolled, and I recommend that Holly's pro se habeas petition under 28 U.S.C. § 2254 be denied as untimely.

### III.   Motion for Leave to Amend

On September 30, 2013, Holly sought leave to amend his petition. (*See* Doc. 27 (motion); Doc. 37 Ex. 1 (proposed amended petition).) Holly raises eight claims in his proposed amended petition, including numerous counts alleging ineffective assistance of counsel, denial of a right to a fair trial by an impartial jury, and a reiteration of his request for equitable tolling. (*See* Doc. 37 Ex. 1.)

Federal Rule of Civil Procedure 15 allows parties to amend or supplement their pleadings, subject to certain restrictions. As a general rule, the court considering a party's motion for leave to amend a pleading "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). However, a court may deny leave to amend for reasons such as undue delay or futility of the amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). If "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," then the amendment is said to "relate[] back to the date of the original pleading." FED. R. CIV. P. 15(c)(1)(B).

Holly's motion is procedurally defective in several respects. First, Holly did not attach a proposed amended petition to his motion for leave to amend, in violation of D.N.M.LR-Civ. 15.1. Courts with similar local rules have routinely denied motions for leave to amend on this basis. *See, e.g.*, *Hammond v. City of Junction City, Kan.*, Nos. 00-2146-CM, 01-2602-CM, 01-2603-CM, 2002 WL 31545354, at *4 (D. Kan. Nov. 18, 2002) (unpublished). For what it is worth, Holly eventually did file a proposed amended petition (Doc. 37 Ex. 1) on February 14, 2014, approximately four and a half months after filing his motion, after I instructed him to do so over two weeks earlier (*see* Doc. 30).

Second, Holly's motion and his proposed amended petition were both drafted and filed on his behalf by his court-assigned counsel. However, I appointed counsel for the sole and limited purpose of addressing Holly's equitable tolling argument. (*See* Doc. 15 at 3.) Although the motion and proposed amended pleading briefly address equitable tolling, they also raise many other arguments, including several that were not raised in Holly's pro se petition. The actions of Holly's court-appointed counsel plainly exceeded the scope of his appointment.

The truly fatal defect in the motion, however, is that it is untimely. The one-year AEDPA limitations period found in § 2244(d)(1) applies to any habeas claims brought under § 2254 and is not tolled by the filing of a federal habeas petition. *See Duncan v. Walker*, 533 U.S. 167, 181 (2001). The intersection of Rule 15 and § 2244(d)(1) has led the Tenth Circuit, among other appellate courts, to deny any untimely motion to amend a habeas petition that raises a claim that does not relate back to the date on which a timely petition was filed:

> [A]n untimely amendment to a [habeas] motion which, by way of additional facts, clarifies or amplifies a claim or theory in the [original motion] may, in the District Court's discretion, relate back to the date of [the original motion] if and only if the [original motion] was timely filed and the proposed amendment does not seek to add a new claim or to insert a new theory into the case.

*United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000) (quotation omitted) (applying the rule to § 2255 motions); *see also Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001) (extending the rule to § 2254 petitions). Therefore, in order for a claim in Holly's proposed amended petition to be timely, his original habeas petition must have been timely, and the claim in his proposed amended petition must either (1) be timely under AEDPA's one-year statute of limitations, or (2) clarify or amplify a claim that appeared in his original habeas petition. *See Espinoza-Saenz*, 235 F.3d at 504-05.

Holly's motion for leave to amend was plainly filed after the AEDPA limitations period expired on May 14, 2010. Moreover, a cursory review suggests that many of the claims in the proposed amended petition do not have an analog in Holly's earlier petition and thus do not clarify or amplify any original claims. *See id.* at 505 (quotation omitted) (noting that a purportedly new claim that is distinct "in both time and type" from a claim in the original petition does not clarify or amplify the earlier claim, even if both claims arise from the same judicial proceedings). However, the Court need not reach this question. As Holly's original petition was untimely, the claims raised in his untimely proposed amended petition cannot relate

back to a timely claim. Because the claims in the amended petition would therefore be untimely themselves, I recommend that the Court deny Holly's motion for leave to amend.

### CONCLUSION

For the foregoing reasons, I recommend that the Court DENY Holly's original habeas petition (Doc. 1) as untimely, DENY Holly's motion for leave to amend (Doc. 27), and DISMISS this cause with prejudice. I also recommend that the Court deny Holly a certificate of appealability. *See* 28 U.S.C. § 2253(c).

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.